MILLER, Judge pro tem.
This case was consolidated with No. 5625 styled, Arrow Food Distributors, Inc., v. Thurman, Jr. et al., La.App., 144 So.2d 398. The facts and the questions of liability are decided and are fully discussed in the companion suit. The District Judge rendered judgment in favor of plaintiff, and against Henry L. Thurman, Jr., and Employers Liability Assurance Corporation, Ltd., jointly, in the principal sum of $10,000.00, with legal interest from judicial demand until paid. Because of our resolution of the question of liability decided in the companion suit, that portion of this judgment holding Henry L. Thurman, Jr., liable to plaintiff, is reversed.
The evidence shows that John Dewitt Lee was 15 years of age at the time of this accident. As a result of the accident, he sustained a fracture of the metacarpal bone of the left hand, a badly comminuted fracture of the distal portion of the left femur and multiple contusions, abrasions, and lacerations about the face. Dr. William E. Smith, orthopedic surgeon, saw him on admission to the hospital and testified that Lee was in a “great deal of pain and was emotionally disturbed.” Lee was immediately taken to the operating room and his leg was placed in reduction traction. In order to do this, a %2 inch diameter pin was drilled through the proximal tibia and traction weights were attached thereto. It took two or three days of manipulation and adjustment (which the Doctor described as a '“painful process”) to place the broken bone in its proper position. It was found necessary to keep him under narcotics for a period of two weeks and in the hospital for 120 days. During all of the time that Lee was in the hospital, he was in traction using weights up to 42 pounds. Lee developed an “area of superficial pressure abrasion in his popliteal area * * * ” which was “ * * * caused by the extreme amount of weight that has to be applied to the extremity in order to keep the bone in its reduced position.” Lee’s mother testified that because her son was so fearful about the medical treatment, she stayed with him night and day in the hospital for sixteen weeks. During this time, the traction required that Lee remain on his back. According to Dr. Smith, Lee’s only pleasure was eating and he gained considerable weight during his hospital confinement.
After Lee left the hospital, his leg was kept in a “long leg ischial weight bearing” brace until February 24, 1961, slightly more than a year after the accident. Dr. Smith described the brace as having “ * * * two metal uprights and it has a ring which fits on the ischium or the bone that we ordinarily sit on. It fits very snugly * * * in other words, he sits on the brace as he walks. * * * ”
Lee was seen by Dr. Smith in his office on June 22, 1960, for “a check at that time to see how he was coming along with his walking with his braces and his crutches. His brace was found to fit satisfactorily at that time, X-rays were repeated at that time which showed satisfactory position of his fracture and early union which I defined to myself as precarious union. * * * This means that unless this patient exerted — unless this patient was careful in the use of his weight bearing and the use of his brace he could rebreak this bone. He was advised to continue cautious partial weight bearing with his brace and return to see me in six weeks. John was brought back to see me on August 3, 1960. At this time X-rays were repeated of his femur and they showed further consolidation. Union was by no means complete and he was again instructed to continue with his partial weight bearing. He was also placed on some exercises for his hand and for his leg at that time.”
During August, 1960, Dr. Smith was considering making a bone graft, because the healing was progressing at such a slow rate. On August 3, 1960, Lee was started on a vigorous program of physical therapy. Dr. Smith next saw Lee in his office on August 22, 1960, “at which time he was found to be progressing satisfactorily. The muscle strength in both his arm and leg was im *410 proving. He was advised to continue with his exercises, his weight bearing with his brace and return in three weeks. On September 12, 1960 he returned to my office and was found to be regaining the motion in his knee quite well. He was still wearing his brace, X-rays again were repeated and showed again further consolidation. He was continued with his brace and his exercises and instructed to return again in three weeks. On October 3, 1960 he returned and was found again to have progressive re-use of his left knee, particularly. He was instructed to continue with his brace and exercises and return in six weeks. No X-rays were taken at that time. On November 14, 1960, this patient returned to my office. His brace was removed (for X-rays only). Repeat X-rays at that time showed that consolidation was progressing but at a rather slow rate which could be normal for this stage of recovery. On January 9, 1961, X-rays were again taken. At this time consolidation had occurred still further and only a small portion of the fracture line was still visible anteri-orly on the lateral view. He was advised to continue with his brace and normal activity and return to me in eight weeks. On February 24, 1961, X-rays again were repeated and showed what I consider to be enough union to allow us to discontinue the brace, provided that the individual would not engage in any unusually strenuous activities, particularly twisting types of strains to the leg.”
As of March 24th, X-rays still showed the fracture line in one or two small segments, and plaintiff was given a prescription for a Y2 inch heel lift to be applied to his left shoe to compensate for his shortened leg. The shortness will be permanent.
On June 28th, 1961, Lee “had his heel lift applied and was walking again with no dis-cernable limp. He was found to have an approximate five degree restriction of full flexion in the left knee as compared to the right. He was found to continue to display some slight muscle atrophy in this lower extremity. Repeat X-rays at that time showed complete union of his fractured femur.”
Dr. Smith was of the opinion that Lee will suffer discomfort during any change in the weather “within the foreseeable future,” but he will be able to attempt to engage in regular activities such as football around the fall of 1962; and that when he reaches maturity, he should be able to engage in any type of occupational duty that he would ordinarily have been expected to attempt.
Two orthopedic surgeons testified that Lee will suffer a 10% permanent partial disability of the left leg.
Lee’s injuries to his hand required the casting of his hand and forearm. The case was removed after five or six weeks and Lee went through the normal period required to exercise and limber up the hand before it was completely recovered. Dr. Smith testified that there was no evidence of residual disability from the hand after the period of intensive physical therapy during August of 1960.
Neither plaintiff nor defendant has cited any cases dealing with quantum awarded for injuries of a similar nature. In view of the fact, however, that young Lee was in serious pain, subjected to such a 4 month hospital confinement in traction, subjected to such long treatment in the brace, required over one year for the fracture to heal, and his injuries have resulted in some permanent disability, we are of the opinion that those injuries are substantially more serious than the injuries suffered by Henry L. Thurman, Jr., for which we have this date allowed $12,500.00, 144 So.2d 398. In our opinion, an award in the sum of $17,500.00 is fair and adequate compensation' for the injuries sustained by John Dewitt Lee.
For these reasons and for the reasons assigned in No. 5625, the judgment of the District Court holding Henry L. Thurman, Jr., liable to plaintiff in this suit for the injuries suffered by John Dewitt Lee, Jr., is reversed, and plaintiff’s cause of action against Henry L. Thurman, Jr., is dismissed.
*411 The District Court judgment in favor of Ayliss E. Lee, Sr., for and on behalf of his minor son, John Dewitt Lee, and against Employers Liability Assurance Corporation, Ltd., is amended by raising the award therein granted from $10,000.00 to $17,500.-00 with legal interest thereon from judicial demand until paid and as amended such judgment is affirmed. Defendant, Employers Liability Assurance Corporation, Ltd., to pay all costs of this appeal.
Amended and affirmed.